**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Amanda Wray, et al., | No. CV-22-00859-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| Jann-Michael Greenburg, et al., | |
| Defendants. | |

## INTRODUCTION

Amanda Wray, Kimberly Stafford, and Edmond Richard (together, "Plaintiffs") are the parents of children who attended school in the Scottsdale Unified School District ("SUSD" or "the District").  (Doc. 34 ¶ 1.)  In this action, Plaintiffs bring claims against four Defendants: (1) SUSD; (2) SUSD board member Jann-Michael Greenburg ("Jann-Michael"); (3) Jann-Michael's father, Mark Greenburg ("Mark"); and (4) Mark's wife, Dagmar Greenburg ("Dagmar").  (*Id.* ¶¶ 9-12.)

In broad strokes, Plaintiffs allege that after they "formed associations with like-minded parents" in mid-2020 an effort to "stand[] up for children and engag[e] in the political process," including by raising "issues related to SUSD's COVID-19 policies," Defendants conspired together to "silence and punish [Plaintiffs'] dissenting voices and frighten away other potential speakers who might dare express an opposing point of view." (*Id.* ¶¶ 1-2, 16-17.)  According to Plaintiffs, Mark's role in this conspiracy was to gather various forms of "sensitive and personal data about Plaintiffs and other parents," which

was stored in a Google drive account, that could be used "to attack Plaintiffs publicly and privately, with the intent to silence their speech." (*Id.* ¶¶ 19-29.)

Now pending before the Court is a motion by Mark and Dagmar (the "Moving Defendants") to dismiss all of Plaintiffs' claims against them. (Doc. 36.) For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

I.    Relevant Factual Allegations

The facts below, which are presumed true for purposes of the pending motion to dismiss, are derived from Plaintiffs' First Amended Complaint ("FAC"). (Doc. 34.)

In August 2020, Plaintiffs and other SUSD parents and stakeholders formed a private Facebook group called "Scottsdale Unified—CAN (Community Advocacy Network)." (*Id.* ¶ 16.) Wray was the group's administrator, and Stafford also served as an administrator before she left the group in March 2021. (*Id.*) "The Facebook Group initially began as a way for concerned parents to discuss issues related to SUSD's COVID-19 policies, but later expanded its focus to include general matters of concern such as curriculum, school budgetary priorities, and student safety." (*Id.* ¶ 17.) Plaintiffs generally "dared to express opinions contrary to the District's chosen course of action." (*Id.* ¶ 18.)

Following the creation of the Facebook group, "Defendants began to collect information about individuals they viewed as their political enemies, including Plaintiffs." (*Id.* ¶ 19.) "[F]or over a year, Defendants gathered Plaintiffs' public and private data, internally shared [that] information (including private communications solely possessed by the District)," and placed that information in a "public Google drive." (*Id.* ¶¶ 19-20.) "The drive included addresses, a full social security number, background checks, divorce records, photographs, videos, recordings, internal unredacted communications parents had with the District, and much, much more" and eventually contained "approximately 100 gigabytes of data." (*Id.* ¶ 20.) The FAC sometimes refers to the contents of the drive as "the Dossier." (*Id.* ¶¶ 2, 20-21, 37, 46-49, 54, 56.)

"Mark . . . was primarily responsible for gathering, storing, and strategically

disseminating Plaintiffs' . . . information." (*Id.* ¶ 21.)  For example, "Mark . . . videotaped, obtained photographs (including of Plaintiffs' minor children), and recorded Plaintiffs as well as other local parents and children." (*Id.* ¶ 23.)  "Mark . . . also collected various other sensitive and personal data about Plaintiffs and other parents," including Wray's employment history and mortgage records, Stafford's "high school information, birthday, child's name and age, and state of residence," 15 background checks on Plaintiffs and other parents (including a "162-page 'comprehensive report' on one individual"), bankruptcy filings, traffic court records, criminal records, business and licensing information, mortgage documents, credit history information, and demographic information. (*Id.* ¶ 24.) The Dossier also included "a bankruptcy record for an individual sharing Amanda Wray's maiden name and home state, which circumstances would have shown was not Ms. Wray." (*Id.* ¶ 25.)  When compiling this information, Mark sometimes "impersonated others on social media to gain access to their private groups." (*Id.* ¶ 29.)  Finally, the Dossier contained a meme about Wray, which said:

> Meet Amanda Wray, community activist and moderator of the SUSD CAN Page and wife of Daniel Wray, a VP of Sales for National General Insurance. Ms. Wray advocates for reducing access to Covi-19 [sic] vaccines to the underserved communities within the SUSD School District and believes she has been called by God to offer her dubious financial planning services to families seeking to enroll their children in private religious schools.  Ms. Wray might want to get her own financial house in order before giving advice to others.  She has two mortgages on her primary residence and used the proceeds of the second mortgage to buy a vacation home in Prescott, which she is operating as an Airbnb.  We are so happy to have her here in the Scottsdale Unified School District.  Sunshine is the best disinfectant.  End racism now within our community[.]

(*Id.* ¶ 65.)

On an unspecified date, Jann-Michael accidentally revealed the existence of the Dossier when, to support his claims that the Facebook group was unable to "control racist, homophobic, transphobic, anti-Catholic, anti-Semitic, and other discriminatory content," he "attached a screenshot of the public Google Drive hyperlink to one of the many files [Mark] had amassed about the Facebook Group" to an email sent from his "official District email account." (*Id.* ¶ 61.)  "On September 29, 2021, Amanda Wray was provided with a

hyperlink to the Google Drive, which was openly accessible by anyone with the link that [Jann-Michael] had broadcast, and discovered that [Mark] had stored all the various files described in this Complaint and had shared those files with Board members [Jann-Michael] and Zach Lindsay, as well as Jennifer McDowell, a community member supportive of the Greenburgs." (*Id.* ¶ 62.)  After discovering the "staggering amount of information [Mark] had compiled about her or purportedly about her, Ms. Wray became physically ill and vomited." (*Id.* ¶ 63.)

Mark's "efforts to investigate Plaintiffs' activities often immediately followed [Plaintiffs'] criticism of [Jann-Michael] or SUSD." (*Id.* ¶ 27.)  For example, "[b]etween August 20 and 21, 2021, Mark . . . created at least fifty-seven screenshots of Amanda Wray's social media activity, all of which he saved to the Google Drive." (*Id.* ¶ 26, emphasis omitted.)  Then, the "District directly prevented the public from attending and making their concerns known at [an] August 24, 2021 board meeting." (*Id.* ¶ 39.)  At the same time, "[Jann-Michael] was on social media repeatedly comparing Facebook Group members to Nazis, stating '[t]he comparison is apropos' and claiming that they had 'made anti-Semitic, racist, and xenophobic comments.'" (*Id.* ¶ 40.)  "Between August 25, 2021, and September 1, 2021, the Scottsdale Parent Council, an association of involved parents in which Amanda Wray was involved, received ten anonymous complaints by email about Amanda Wray which included unfounded and demeaning statements about Ms. Wray. Upon information and belief, [Mark] sent some or all of these complaints using information gleaned from the Dossier and from private District records." (*Id.* ¶ 49.)

Mark also engaged in various intimidation tactics.  In one incident, "[u]sing Plaintiff Kim Stafford's employment history from the Dossier, [Mark] made veiled threats against her employment because she publicly supported in-person schooling. . . . And lest the implication be mistaken, in addition to publicly posting his threat, [Mark] also sent it to Ms. Stafford via direct message." (*Id.* ¶ 48.)  Mark also "regularly used terms like 'mentally repulsive,' 'racist,' 'white supremacist,' 'psychos' and 'parasite,' to refer to Plaintiffs.  He referred to one critic as 'more like an animal than an actual person.'" (*Id.*

¶ 50.)  On July 7, 2021, Mark "recorded a video of a discussion on the SUSD-CAN Facebook page where he, among other things, stated out loud after coming across a comment by Edmond Richard criticizing SUSD policies, 'I really want Edmond to die.  I'll be so happy.  I'll have a fucking party.'"  (*Id.* ¶ 22.)

Mark also "tried to physically intimidate Plaintiffs to prevent them from expressing their point of view."  (*Id.* ¶ 52.)  For example, "[o]n January 19, 2021, Amanda Wray attended an SUSD Board meeting.  [Mark] arrived after the meeting began and made eye contact with Ms. Wray when she turned her head to see who had entered the meeting room. [Mark] initially sat on the left side of the room, with multiple chairs separating he and Ms. Wray.  After several minutes, [Mark], who is a large man, got up and moved seats to sit directly behind Ms. Wray.  He repeatedly and purposefully coughed at her.  Ms. Wray felt intimidated by [Mark's] actions and made her fears regarding [his] alarming behavior known to the District.  The District, rather than acting to protect Ms. Wray, promptly relayed her concerns, unredacted, directly to the perpetrator."  (*Id.* ¶ 53.)  "Shortly after" this incident, Mark messaged Wray from the "fake Frank Graham account," stating, "I finally saw you in person.  You might want to buy a peloton bike."  (*Id.* ¶ 55.)  Similarly, Jann-Michael "at an August 24, 2021 Board meeting . . . whispered the following into his microphone after Amanda Wray made a public comment: 'Jesus fucking Christ, these people.'"  (*Id.* ¶ 57.)

While documenting Plaintiffs' activities and online interactions, "Mark . . . kept SUSD officials apprised of his conduct.  For example, on September 12, 2020, Mark . . . took a screenshot of an argument he was having on a Facebook comment thread with Kathleen Angelos, who was running for an open seat on the SUSD Governing Board at the time, in which he accused her of racism.  In that same screenshot, Mark . . . can be seen speaking on Facebook Messenger with Zach Lindsay, then a candidate for the SUSD Board, who later had access to the Google Drive as a member of the SUSD Board.  Mark . . . wrote, 'I'm baiting her[.]  She's so fucking stupid.'"  (*Id.* ¶ 28.)  Mark also used fake profiles to post comments and capture Plaintiffs' interactions on social media.  (*Id.* ¶ 29.)

While "Mark . . . was using dubious public means to gather information, Jann-Michael and the District were curating and collecting Plaintiffs' and other parents' personal information and communications." (*Id.* ¶ 30.) "Defendants had a pattern and practice of using SUSD funds, access, and resources to contribute Plaintiffs' private information to the Google Drive's cache of data." (*Id.*)  As evidence of SUSD's involvement in Mark's activities, Plaintiffs note that the Dossier included unredacted copies of: (1) "emails exchanged between Amanda Wray and Superintendent Scott Menzel which could only have been obtained from District staff or agents and from the District's email system"; (2) "emails Kim Stafford sent to the district which could only have been obtained from District staff or agents and from the District's email system"; and (3) an "unredacted email of a parent named Jake Davis raising concerns about [Jann-Michael's] conduct as a board member and [Mark's] actions of taking pictures of students and parents before a board meeting, which could have only been obtained from District staff or agents and from the District's email system." (*Id.* ¶ 31.)  According to Plaintiffs, Mark also made public records requests directly after these private emails were sent, as a cover for SUSD's inappropriate dissemination of information.  (*Id.* ¶ 34.)

A separate component of the alleged conspiracy was SUSD's selective enforcement of District policies.  (*Id.* ¶ 36.)  For example, after the SUSD mask mandate went into effect, "a small number of parents (not the Plaintiffs)" were disruptive at a school board meeting that caused the meeting to be adjourned early, despite the fact that "most attendees were wearing masks" and "most attendees were seated and quiet as they prepared for the meeting to begin." (*Id.*)  Superintendent Menzel "described the meeting as having 'felt like a January 6th moment' and attendees as 'agitated and non-compliant.'  He further specifically singled out the Facebook Group as being the source of some 'rumbling.'" (*Id.*) "The following week, Superintendent Menzel provided the SUSD Board with a subsequent written update after a meeting with some members of the Facebook Group.  He admitted to those present that, while he was not a member of the group, he had been monitoring the Facebook Group's speech.  On information and belief, he had been monitoring the

Facebook Group by way of information gathered and provided to the District by Mark . . . from the Dossier." (*Id.* ¶ 37.)  Additionally, a public records request made by Wray in November 2021 revealed that "Superintendent Menzel had emailed himself a screenshot, the file name of which began with 'AMANDA BLAMING GREENBURG . . .' depicting comments that Ms. Wray and another person made on Facebook." (*Id.* ¶ 38.)  Notably, "[t]he Google Drive contained a PDF entitled, 'AMANDA BLAMING GREENBURG SHENANIGANS ON INABILITY OF DISTRICT TO HIRE SUPER,' and included the very same screenshot Superintendent Menzel included in his email." (*Id.*)

The District also selectively enforced its trademarks against the Facebook group. (*Id.* ¶ 42.)  Because "SUSD" is a trademarked term, SUSD's lawyers reached out to the Facebook group in July 2021 and requested they cease using SUSD in the group's name. (*Id.* ¶¶ 42-43.)  But the same request was not made to a related "SUSD Teacher Support group," although that group had changed its name in June 2021 to remove SUSD. (*Id.* ¶ 42.)  "Photos of the cease-and-desist letter sent from the District's Counsel directly to the Facebook Group were also found in the Google Drive, along with a video of Mark . . . and Jann-Michael . . . discussing the contents of the letter." (*Id.* ¶ 45.)

After "Defendants' conspiracy became public," SUSD hired a crisis communications firm to provide consulting and social media monitoring services. (*Id.* ¶ 66.)  "[P]rior to this the District had been relying on Mark . . . and the information he collected and disseminated for its social media monitoring." (*Id.* ¶ 67.)  "To date, the District still has not provided any answer as to how Superintendent Menzel monitored the internal communications of the private Facebook Group of which he was not a member. The District has also not provided any explanation for how Plaintiffs' private, unredacted emails to District officials made their way to the Google Drive." (*Id.* ¶ 69.)

After the Dossier became public, Mark sued Wray (and her husband, Daniel) in separate actions in state and federal court. (*Id.* ¶¶ 70-72.)  In the state-court lawsuit, Mark "assert[ed] various privacy torts . . . arising from Ms. Wray's statements about the wrongdoing alleged in this Complaint." (*Id.* ¶ 71.)  In the federal action, Mark alleged

1    "that Ms. Wray violated the federal Computer Fraud and Abuse Act when she accessed the

2    publicly available Google Drive whose address Jann-Michael . . . had shared." (*Id.* ¶ 70.)

3            In June 2022, the Arizona Attorney General's office "filed a Complaint against

4    Jann-Michael . . . and the District for their violations of Arizona's Open Meeting Law."

5    (*Id.* ¶¶ 73-80.)  Specifically, "Attorney General Brnovich alleged that Jann-Michael . . .

6    and the SUSD Board purposefully tried to evade the requirements of the Open Meeting

7    Law and silence comments relating to the District's proposed mask mandate by bifurcating

8    the August 17, 2021 SUSD Board meeting." (*Id.* ¶ 76.)

9            Based on the forgoing allegations, Plaintiffs assert six causes of action in the FAC.

10   In Count One, Plaintiffs assert a First Amendment retaliation claim pursuant to 42 U.S.C.

11   § 1983 against all Defendants.  (*Id.* ¶¶ 82-111.)  In Count Two, Plaintiffs assert a separate

12   First Amendment claim pursuant to 42 U.S.C. § 1983 against Jann-Michael.  (*Id.* ¶¶ 112-

13   22.)  In Count Three, Plaintiffs assert a claim for intentional infliction of emotional distress

14   against the Moving Defendants.  (*Id.* ¶¶ 123-30.)  In Count Four, Plaintiffs assert a claim

15   for negligent infliction of emotional distress against the Moving Defendants.  (*Id.* ¶¶ 131-

16   38.)  Finally, in Counts Five and Six, Wray alone asserts claims against the Moving

17   Defendants for defamation and false light invasion of privacy.  (*Id.* ¶¶ 139-56.)

18   II.   Procedural History

19           On May 5, 2022, Plaintiffs filed this action in state court.  (Doc. 1-3 at 5-35.)

20           On May 18, 2022, the Moving Defendants removed this action to federal court.

21   (Doc. 1.)

22           On July 14, 2022, Plaintiffs filed the FAC.  (Doc. 34.)

23           On July 28, 2022, the Moving Defendants filed the pending motion to dismiss (Doc.

24   36), which is now fully briefed  (Docs. 43, 48).

25           On November 30, 2022, the Court issued a tentative ruling.  (Doc. 57.)

26           On December 16, 2022, the Court heard oral argument.  (Doc. 59.)  During oral

27   argument, neither side sought to challenge the conclusions in the tentative ruling.

28           …

**DISCUSSION**

I.     Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1444-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678-79. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

II.    Procedural Challenges

A.    **Notice Of Claim**

1.    The Parties' Arguments

The Moving Defendants argue that because Plaintiffs allege that Mark acted under the color of law for purposes of their § 1983 claim, Plaintiffs were also required by A.R.S. § 12-821.01 to file a notice of claim before they could proceed on their state-law claims. (Doc. 36 at 1.)

Plaintiffs characterize this argument as "bizarre[]" given that Mark "is not a 'public entity, public school or a public employee'" and therefore does not meet the eligibility requirements of A.R.S. § 12-821.01. (Doc. 43 at 5-6.) Plaintiffs continue: "Notably, Mark cites no authority that supports his argument that a private individual who acts under color of law must be treated as a public official when he is also sued in his personal capacity in tort—there is no such authority." (*Id.* at 6.) Plaintiffs further argue that the "purpose of

§ 12-821.01 is to provide public entities with an opportunity to investigate the claim, evaluate potential liability, conduct settlement negotiations, and budget accordingly," and thus the "statute clearly has no application to tort claims against a private citizen, as Mark[,] not SUSD, will be liable for any damages assessed against him in this lawsuit." (*Id.*)

In reply, the Moving Defendants contend that Plaintiffs "cannot have it both ways: If [Mark] is not acting under color of state law, they have no Constitutional claims; if [Mark] was acting under color of state law, they were required to issue a Notice of Claim pursuant to A.R.S. § 12-821.01." (Doc. 48 at 2.)  The Moving Defendants contend that, based on the statutory language of § 12-820(1) "and [Plaintiffs'] allegations that Mark was directed and authorized by SUSD to perform services for it, Plaintiff was required to issue a Notice of Claim in relation to [Mark]." (*Id.*)

## 2.  Analysis

The Moving Defendants are not entitled to the dismissal of Plaintiffs' state-law claims based on Plaintiffs' purported non-compliance with A.R.S. § 12-802.01.

"In order to state a claim under 42 U.S.C. § 1983, [plaintiffs] must show two essential elements: (1) that the defendants acted under color of state law; and (2) that the defendants caused them to be deprived of a right secured by the constitution and laws of the United States." *Howerton v. Gabica*, 708 F.2d 380, 382 (9th Cir. 1983).  Meanwhile, under A.R.S. § 12-821.01(A), "[p]ersons who have claims against a public entity, public school or a public employee shall file claims with the person or persons authorized to accept service for the public entity, public school or public employee as set forth in the Arizona rules of civil procedure within one hundred eighty days after the cause of action accrues."  Arizona defines "employee" in this context as an "officer, director, employee or servant, whether or not compensated or part time, who is authorized to perform any act or service, except that employee does not include an independent contractor," and/or as "noncompensated members of advisory boards appointed as provided by law and leased employees."  *Id.* § 12-820(1).  Additionally, a "public employee" is an "employee of a public entity."  *Id.* § 12-820(6).  Accordingly, in this context, "public employees" are a

subset of "employees" generally.  *Villasenor v. Evans*, 386 P.3d 1273, 1276 (Ariz. Ct. App. 2016).

Here, the Moving Defendants place heavy emphasis on the allegation in the FAC that Mark "acted in concert with [Jann-Michael]."  (Doc. 34 ¶ 87.)  But in the very same paragraph, the FAC clarifies that Mark "is not a District official."  (*Id.*)  Even assuming that a private citizen's efforts to act in concert with a public official may mean the private citizen is acting under color of state law for purposes of a § 1983 claim—an issue that is addressed in later portions of this order—it doesn't follow that such a private citizen is also transformed into a "public employee" for purposes of A.R.S. § 12-821.01(A).  The "public employee" analysis turns on whether, per A.R.S. § 12-820(1), the individual is (1) an officer, director, employee or servant, whether or not compensated or part time, who is authorized to perform any act or service; (2) a noncompensated member of an advisory board as provided by law; or (3) a leased employee.  The factual allegations in the FAC suggest that Mark does not fall into any of these categories—as alleged in paragraph 87, he "is not a District official"—and the Moving Defendants have not proffered any evidence that might support a different conclusion.[1]  To the contrary, the Moving Defendants argue elsewhere in their motion papers that "Mark has never held public office, he is not a SUSD school board member, he is not an SUSD employee, he is not an SUSD agent, and does not have any matters pending before SUSD.  Furthermore, Mark does not volunteer for SUSD nor has he been a member of any SUSD committees."  (Doc. 48 at 6.)

…

…

---

[1]     It is unclear whether the Moving Defendants could have proffered evidence outside the pleadings in an attempt to secure dismissal on this basis.  *Udd v. City of Phoenix*, 2018 WL 6727267, *5 n.2 (D. Ariz. 2018) (noting that "there is disagreement on th[e] question" of which portion of Rule 12(b) governs a motion to dismiss based on non-compliance with Arizona's notice of claim statute, with some courts applying Rule 12(b)(6), other courts applying Rule 12(b)(5), and still other courts reasoning that "the notice of claim statute constitutes [a] failure to exhaust non-judicial remedies . . . which is subject to an unenumerated Rule 12(b) motion to dismiss") (citations and internal quotation marks omitted).  But even assuming they could have attempted to do so, they did not proffer any evidence here.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

B.   **Compulsory Counterclaims**

1.   The Parties' Arguments

The Moving Defendants argue that, because Mark already sued Wray in federal and state court and "the foundation" for the complaints in all three lawsuits is "the existence, discovery, and publication (by Plaintiffs) of the private Google drive," Wray's claims here are compulsory counterclaims under Federal Rule of Civil Procedure 13 and are thus "waived and barred."  (Doc. 36 at 1-3.)  As for the claims brought by Richard and Stafford, the Moving Defendants argue that, had Wray's compulsory counterclaims been appropriately filed in the earlier cases, Richard and Stafford would have been joined as required parties and would have been able to assert their claims in those cases.  (*Id.* at 3, citations omitted.)  The Moving Defendants contend that, instead of filing compulsory counterclaims, "Plaintiffs called a press conference and filed their complaint as a new lawsuit, a move that fails to promote judicial economy and results in a substantial duplication of effort and time."  (*Id.*)

Plaintiffs characterize this argument as "meritless."  (Doc. 43 at 6.)  As an initial matter, Plaintiffs note that the Moving Defendants "provided the Court with no evidence (let alone properly authenticated evidence appropriate for consideration on a Rule 12(b)(6) motion) from which the Court could possibly conclude that Plaintiffs' claims arise from the same transaction or occurrence as the claims Mark asserted in his two lawsuits.  Mark essentially invites the Court to go on an independent scavenger hunt for the information about these lawsuits Mark failed to provide."  (*Id.*)  Turning to the merits, Plaintiffs argue that the federal action (which involved a claim under the Computer Fraud and Abuse Act) does not arise from the same transaction or occurrence as the claims here because it was "based solely on [Wray] accessing the Google Drive."  (*Id.* at 6.)  As for the state-court action, Plaintiffs contend it was "based on isolated statements [Wray] made that are not at issue here and her accessing the Google Drive."  (*Id.* at 6-7.)  Plaintiffs continue: "The factual issues in this case (involving Defendants' violations of Plaintiffs' First Amendment rights) are wholly distinct, as this Court will examine neither the propriety of Ms. Wray

accessing the Google Drive nor the nature of several statements Ms. Wray allegedly made about Mark." (*Id.* at 7.)  Next, Plaintiffs argue that the Moving Defendants' arguments lack merit for the additional reason Wray had not yet filed a "pleading" within the meaning of Rule 13 in response to the state or federal lawsuits at the time this action was filed, so there was no mechanism "to which Ms. Wray could (let alone must) have attached her counterclaim." (*Id.*)  In a related vein, Plaintiffs contend that because Rule 13 does not require compulsory counterclaims when "the party in the later suit was not a party in the earlier suit," and Richard, Stafford, and Dagmar are not parties to the earlier lawsuits, this provides another reason why the Moving Defendants' argument lacks merit. (*Id.*)  Finally, Plaintiffs argue that "judicial economy would not be served by joining five new parties (Ms. Stafford, Mr. Richard, Jann-Michael, Dagmar, and SUSD) and all the attendant new claims to either of Mark's actions because they do not involve the same evidence or legal theories," so even if the court were inclined to reject Plaintiffs' other arguments, "it should exercise its discretion to let Ms. Wray's claims against Mark proceed in this action" or "consolidate the actions" under Federal Rule of Civil Procedure 42. (*Id.* at 8.)

In reply, the Moving Defendants urge the Court to take judicial notice of the pleadings in the other cases. (Doc. 48 at 2.)  The Moving Defendants describe Mark's state-court action as including claims for "defamation, false light, intrusion upon seclusion, and public disclosure of private fact claims" based on Wray accessing the Google drive and various Facebook posts "made by Plaintiff Wray smearing [Mark] and making false, defamatory statements against him." (*Id.* at 2-3.)  They argue that "[b]ecause the claims [in the state-court case] are so similar to those pending in this case," "Wray is required to bring them as a counterclaim and not a separate lawsuit." (*Id.* at 3.)  As for the federal action, Mark contends that the Computer Fraud and Abuse Act claim focuses on "Ms. Wray's unauthorized access of the Google drive," and while the motion doesn't explain precisely why the causes of action overlap, nevertheless, the answer Wray filed "did not include this compulsory counterclaim." (*Id.*)  Finally, the Moving Defendants contend that had the compulsory counterclaims been filed appropriately, Stafford and Richard would

1   have been joined as required parties and similarly would have been required to plead their

2   claims in Mark's original lawsuits.  (*Id.* at 4.)   The Moving Defendants also contest

3   Plaintiffs' version of the procedural history in the federal case, stating "this is not a situation

4   in which Wray filed an Answer before the causes of action brought in the current matter

5   had not yet matured" because "Plaintiffs filed their First Amended Complaint[] two weeks

6   after Wray filed an Answer in the computer fraud case" and the "claims brought in this

7   case had [already] accrued."  (*Id.* at 3.)   Finally, the Moving Defendants argue that any

8   case law cited by Plaintiffs is distinguishable and that the facts of the earlier lawsuits

9   require dismissal.  (*Id.* at 4-5.)

10                      2.    Analysis

11          A counterclaim is compulsory if it "arises out of the transaction or occurrence that

12   is the subject matter of the opposing party's claim" and "does not require adding another

13   party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a)(1).  "A

14   counterclaim which is compulsory but is not brought is thereafter barred."  *Baker v. Gold*

15   *Seal Liquors, Inc.*, 417 U.S. 467, 469 n.1 (1974).  "Arizona Rule of Civil Procedure 13(a),

16   which defines a compulsory counterclaim, is identical to Federal Rule of Civil Procedure

17   13(a)." *Pochiro v. Prudential Ins. Co. of Am.*, 827 F.2d 1246, 1249 (9th Cir. 1987).  "Like

18   the federal courts, Arizona applies the liberal 'logical relationship' test to determine

19   whether two claims arise out of the same 'transaction or occurrence.'" *Id.* (quoting Fed.

20   R. Civ. P. 13(a)).  In deciding whether a claim is compulsory, the phrase "transaction or

21   occurrence" is "read broadly." *Id.* at 1252.  Under the logical relationship test, the court

22   "analyze[s] whether the essential facts of the various claims are so logically connected that

23   considerations of judicial economy and fairness dictate that all the issues be resolved in

24   one lawsuit." *Id.* at 1249 (citation omitted).  "A logical relationship exists when the

25   counterclaim arises from the same aggregate set of operative facts as the initial claim, in

26   that the same operative facts serve as the basis of both claims or the aggregate core of facts

27   upon which the claim rests activates additional legal rights otherwise dormant in the

28   defendant." *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1196 (9th Cir. 2005) (quoting *In re*

*Pinkstaff*, 974 F.2d 113, 115 (9th Cir. 1992)).

At this stage of the case, the Court declines to go on a "scavenger hunt" to determine whether Plaintiffs' claims should have been asserted as compulsory counterclaims in Mark's earlier actions.  The Moving Defendants did not provide copies of the operative complaints in the other actions, let alone provide any detailed comparison of the pleadings.  On this record, the Court cannot conclude that, as a matter of law, the claims in Mark's other actions bear a logical relationship to the claims in this action.  Although the FAC acknowledges the existence of these other actions and generically notes that at least some of the claims in the state-court lawsuit "aris[e] from Ms. Wray's statements about the wrongdoing alleged in this Complaint" (Doc. 36 ¶¶ 70-72), it does not provide enough information to establish that the claims in those lawsuits "rest upon the same aggregate core of facts."  This issue is better resolved at a time when the Moving Defendants' arguments are accompanied by the underlying documents and are supported with detailed analysis.  Therefore, the request to dismiss on this ground is denied without prejudice to its reassertion at a later stage of the case.  *Compare Pochiro*, 827 F.2d at 1250-51 (affirming dismissal after conducting a detailed comparison of the claims and allegations in the relevant pleadings), *with Velardo v. Fremont Inv. & Loan*, 2008 WL 958184, *3 (M.D. Fla. 2008) ("ASC argues that the entry of summary judgment in the state court action is a final judgment on the merits of the instant claims because those claims were compulsory counterclaims in the state court action.  However, this Court has not been provided with a copy of the original state court complaint, or the order granting summary judgment to ASC.  Without being able to review those documents, this Court cannot determine whether *res judicata* applies.").

III.    Count One: First Amendment Retaliation

In Count One of the FAC, Plaintiffs allege that "Defendants willfully and cooperatively participated in the conspiracy to censor and retaliate against Plaintiffs' political speech while acting under color of state law."  (Doc. 34 ¶ 86.)  Plaintiffs allege that "[a]lthough Mark . . . is not a District official, he acted in concert with Jann-

Michael . . . and the District to chill Plaintiffs' First Amendment rights, such that he acted under color of state law." (*Id.* ¶ 87.)  According to Plaintiffs, "Jann-Michael . . . and the District relied on Mark . . . to carry out their goal of suppressing Plaintiffs' speech and worked closely with Mark." (*Id.*)  Plaintiffs further allege that, to chill and retaliate against them for their speech, Defendants released and used "private information" (*id.* ¶¶ 91-92), selectively enforced SUSD policies (*id.* ¶ 93), violated Arizona's Open Meeting Law (*id.*), and engaged in intimidation tactics intended "to prevent them from further speech" (*id.* ¶ 98).  Plaintiffs conclude: "Defendants' actions would chill a person of ordinary firmness from continuing to engage in protected activity." (*Id.* ¶ 99.)

As the foregoing allegations make clear, and as Plaintiffs clarify in their response (Doc. 43 at 8), Count One is a First Amendment retaliation claim.  The Ninth Circuit has explained that, because the First Amendment "prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech," "[i]f an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment claim." *Boquist v. Courtney*, 32 F.4th 764, 774 (9th Cir. 2022) (cleaned up).  To succeed on such a claim, a plaintiff must establish "that (1) it engaged in constitutionally protected activity; (2) the defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016) (citations omitted).

The Moving Defendants contend that Count One is subject to dismissal for four reasons: (1) failure to plead that Mark acted under color of law; (2) failure to plead that "retaliatory animus" was a "but for cause" of adverse action; (3) absence of adverse action; and (4) absence of "individual injury." (Doc. 36 at 4-9.)  The Court will address each argument in turn.

A.   **Color Of Law**

1.   The Parties' Arguments

The Moving Defendants argue that a "presumption exists that private conduct does not constitute government action 'no matter how discriminatory or wrong.'" (Doc. 36 at 5, citations omitted.)  Although the Moving Defendants acknowledge that a private citizen may be held liable under § 1983 via the law of conspiracy, they argue that "Plaintiffs fail to plead that there was any agreement or meeting of the minds between the parties to conspire to deprive Plaintiffs of a constitutional right and that there was an actual constitutional deprivation." (*Id.* at 7.)  The Moving Defendants also contend that, because the FAC alleges that the records in the Google Drive were public (and, thus, were "openly accessible by anyone") and does not allege that the Facebook group was "'private' or that [Plaintiffs] had any expectation of privacy on a public Facebook Group" (especially given that "*any* member of the public" could join the group and the group "in fact *invited* SUSD board members and other government officials to join"), it follows that there can be no conspiracy.  (*Id.*)

Plaintiffs respond that they "pleaded ample facts showing that Mark worked in concert with Jann-Michael and SUSD to violate Plaintiffs' rights."  (Doc. 43 at 9.) Plaintiffs also clarify that they are not seeking to establish the color-of-law requirement via the conspiracy test and instead "principally rel[y] on the joint action test in order to hold Mark liable under § 1983."  (*Id.*)  Plaintiffs note that the Moving Defendants "do[] not address the joint action test anywhere in the Motion, focusing only on the red herring of conspiracy liability." (*Id.*)  According to Plaintiffs, the FAC demonstrates that "Mark acted in concert with Jann-Michael and SUSD to violate Plaintiffs' First Amendment rights, and they accepted the benefits of his unconstitutional behavior, thereby constituting joint action."  (*Id.* at 10.)  Plaintiffs also argue that the public nature of some of the documents is not dispositive under § 1983 and the unredacted nature of the emails in the Dossier demonstrates that they were "not produced in the normal course pursuant to a Public Records Request." (*Id.*)

In reply, the Moving Defendants argue that the "bottom line is there was no deprivation of a constitutional right" because, for example, "Plaintiffs were able to appear at SUSD board meetings." (Doc. 48 at 5.)  More specifically, the Moving Defendants argue that "Plaintiffs erroneously allege that SUSD prevented the public from attending and voicing concerns at the August 24, 2021, board meeting" even though "SUSD's August public meeting minutes reflect . . . that all individuals who wished to speak were provided the opportunity to do so, in person."[2]  (*Id.* at 6.)  Alternatively, the Moving Defendants argue that Plaintiffs did not adequately plead conspiracy or joint action because "Plaintiffs fail to allege facts to support the notion that Mark . . . , a private citizen, had significant state involvement. . . .  [Mark] is simply a private citizen who pays property taxes in Scottsdale, which are distributed to SUSD."  (*Id.* at 5.)  The Moving Defendants contend that Plaintiffs "cannot connect the dots to show there was a benefit derived by SUSD as a result of the content contained on Mark's private Google drive."  (*Id.* at 6.)

## 2.   Analysis

To prevail on a claim under § 1983, a plaintiff must establish "that the defendants acted under color of state law."  *Howerton*, 708 F.2d at 382.  *See also  Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999) ("Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'") (citations omitted).  "Action taken by private individuals may be 'under color of state law' where there is 'significant' state involvement in the action."  *Howerton*, 708 F.2d at 382.  Among the ways a plaintiff can show significant state involvement is the joint-action test, which asks "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights."  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012) (finding joint action where private casino security guards were trained

---

[2]   On a motion to dismiss, all factual allegations must be accepted and all reasonable inferences must be drawn in Plaintiffs' favor.  Therefore, the contradictory facts asserted by the Moving Defendants in their motion papers (*e.g.*, Doc. 48 at 6) cannot be considered at this stage of the case.

by Las Vegas police and were permitted to issue citations for misdemeanor trespassing). This test "can be satisfied either by proving the existence of a conspiracy or by showing that the private party was a willful participant in joint action with the State or its agents." *Id.* (cleaned up).  Relevant factors include "a substantial degree of cooperative action," *Collins v. Womancare*, 878 F.2d 1145, 1154-56 (9th Cir. 1989) (finding no joint action, even though arrests were precipitated by private parties, where officers conducted their own independent assessment before acting), whether the state has "so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity," *Gorenc v. Salt River Project Agric. Improvement & Power Dist.*, 869 F.2d 503, 507-08 (9th Cir. 1989) (finding no joint action where a utility provider was privately owned, for the benefit of private landowners, and state regulation alone was not enough to confer state action), and whether the state "knowingly accepts the benefits derived from unconstitutional behavior," *Tsao*, 698 F.3d at 1140 (citation omitted).  Ultimately, "there is no specific formula for defining state action." *Howerton*, 708 F.2d at 383 (citation omitted).  "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Id.* (citation omitted).

In *Howerton*, the court concluded that a landlord acted under color of law after a local police officer helped serve a notice of eviction, returned alone the following day to falsely inform the tenant "that the [landlords] were using proper eviction procedures and advised them to quit the premises," advised the tenant of "other available rental units," and a few days later, returned to the premises and "accompanied the [landlords] when they disconnected the power services running to the [trailer]." *Id.* at 381-82.  The Ninth Circuit held the landlords acted under color of law because (1) the police "were on the scene at each step of the eviction," (2) "[a landlord] testified that the police presence gave him the feeling he had the right to cut off the utilities," and (3) "the police officer actively intervened," which could not be seen as passive action. *Id.* at 384.  Altogether, the officer's actions "created an appearance that the police sanctioned the eviction." *Id.*

Here, the Court is satisfied that Plaintiffs have pleaded sufficient factual allegations to satisfy the joint-action test with respect to Mark.  As a general theme, the FAC alleges that Defendants "maliciously targeted" Plaintiffs to reach their end goal of "silenc[ing] and punish[ing] dissenting voices and frighten[ing] away other potential speakers who might dare express an opposing point of view."  (Doc. 34 ¶¶ 1-2.)  Factually, the FAC alleges that "Mark . . . was primarily responsible for gathering, storing, and strategically disseminating Plaintiffs' Dossier information on behalf of the conspiracy, as well as effectuating the goals of retaliating against Plaintiffs and others for their speech."  (*Id.* ¶ 21.)  Mark is alleged to have taken several actions on behalf of the conspiracy, including compiling the Dossier (*id.* ¶¶ 23-26), insulting Plaintiffs in the Facebook group or by direct Facebook message (*id.* ¶¶ 29, 48, 51, 55), generally threatening Plaintiffs (*id.* ¶ 48), physically intimidating Plaintiffs (*id.* ¶ 53), and disparaging Plaintiffs (*id.* ¶¶ 23, 49).  Critically, the FAC also alleges that, as he was compiling the information, "Mark . . . kept SUSD officials apprised of his conduct."  (*Id.* ¶ 28.)  The FAC further alleges that Jann-Michael and others in the District augmented the Dossier being compiled by Mark by adding "[u]nredacted copies of emails . . . which could only have been obtained from District staff or agents and from the District's email system" to the Google drive.  (*Id.* ¶¶ 30-31.)  It is immaterial, at this stage, whether those emails also could have been obtained lawfully through a public records request.  Taking the allegations in the FAC as true, Jann-Michael and the District used "SUSD funds, access, and resources to contribute Plaintiff's private information to the Google Drive's cache of data" (*id.* ¶ 30), which Mark then used against Plaintiffs.  There are also several allegations that imply that Mark's conduct was sanctioned by SUSD officials.  (*See, e.g.*, *id.* ¶¶ 32 ["The Google Drive also included a video conversation of Jann-Michael and [Mark] discussing the contents of the private email from Amanda Wray to the District wherein she told the Superintendent [Mark] had taken actions to harass and intimidate her at a prior SUSD Board meeting."].)

Taken together, Plaintiffs' factual allegations plausibly suggest that Jann-Michael, SUSD, and Mark engaged in joint action to retaliate against Plaintiffs due to Plaintiffs'

protected conduct.  The FAC alleges that Mark was tasked with the "dirty work" of compiling and storing information regarding Plaintiffs and haranguing Plaintiffs with the hope that they would cease criticizing the District while Jann-Michael and SUSD added fuel to the fire (and provided at least some encouragement, given that SUSD officials were repeatedly updated on Mark's conduct) and were using Mark to monitor the Facebook page.  (*See, e.g., id.* ¶ 38.)  At a minimum, the factual allegations show a "substantial degree of cooperative action" between Mark and the board members, *Collins,* 878 F.2d at 1154, and/or "an appearance that the [board members] sanctioned" Mark's conduct, *Howerton*, 708 F.2d at 384.  Therefore, Plaintiffs have adequately alleged that Mark acted under color of law for purposes of their § 1983 claim.

> B.     **Chill A Person Of Ordinary Firmness**

>> 1.     The Parties' Arguments

The Moving Defendants argue that Count One also fails because "SUSD took no adverse action against Plaintiffs based on their expressed views.  Plaintiffs were never deprived of their First Amendment rights to speak at or attend the Board's public meetings, contrary to their pleadings."  (Doc. 36 at 7.)  The Moving Defendants argue that the cease-and-desist letter Plaintiffs received was neither retaliatory nor a "prior restraint on speech"—instead, it only asked that the Facebook group stop using "SUSD" and was meant to prevent confusion.  (*Id.* at 7-8.)  The Moving Defendants further contend that "all individuals who wished to speak on May 18, 2021 (but who were prevented from doing so because the meeting was adjourned early), were provided the opportunity to speak on May 24, regardless of viewpoint or topic."  (*Id.* at 8.)  In a related vein, the Moving Defendants contend that "Plaintiffs erroneously allege that SUSD prevented the public from attending and voicing concerns at the August 24, 2021, board meeting.  Yet the August 24 meeting minutes reflect that all individuals who wished to speak were provided the opportunity to do so, in person.  SUSD received 36 public comments, including one from Ms. Wray." (*Id.*)  Finally, the Moving Defendants contend that SUSD possessed no confidential or private documents and "Plaintiffs fail to plead why redaction of these public records should

be legally required or why they should have been kept private." (*Id.* at 9.)

Plaintiffs respond that the Moving Defendants "ignore[] critical facts in the FAC and misstate[] the law." (Doc. 43 at 11.)  Plaintiffs contend that a First Amendment retaliation claim only requires action that "would chill a person of ordinary firmness from continuing to engage in the protected activity" and identify various paragraphs in the FAC that, in their view, reveal an "official, concerted campaign of retaliatory personal harassment of the government's critics [that] would chill the average person from voicing criticism of official conduct." (*Id.* at 12, emphasis and internal quotation marks omitted.)

In reply, the Moving Defendants argue that "Plaintiffs ignore the fact that the SUSD Teacher Support Group that also used 'SUSD' in its title stopped using 'SUSD' in its title by June 15, 2021, over a month before SUSD-CAN received the cease-and-desist letter on July 28, 2021." (Doc. 48 at 6.)  Next, the Moving Defendants argue that Plaintiffs cannot claim that the contents of the Dossier had any chilling effect because Wray, after accessing the Dossier "without permission or authority, . . . immediately went to the media and publicized [its] content." (*Id.*)  Thus, the Moving Defendants contend that the Dossier had the "opposite impact" of chilling, as Wray "found herself being interviewed on cable news channels discussing the Google drive, its contents, and her dislike of [Mark]." (*Id.* at 6-7.) Regarding any publication of the documents within the Dossier, the Moving Defendants argue that the "contents of the drive consisted of public records—not private information," as confirmed by the Scottsdale Police Department, and Plaintiffs were the ones who publicized the Dossier's contents. (*Id.* at 7.)  Finally, the Moving Defendants argue that "there is nothing illegal about taking videos in public places where there is no expectation of privacy or posting videos criticizing Mr. Richard on YouTube." (*Id.*)  According to the Moving Defendants, the FAC "seeks to make illegal the exceptionally common practice of conducting background research." (*Id.*)

### 2.   Analysis

The Moving Defendants' arguments misunderstand the First Amendment retaliation framework.  As noted, in the Ninth Circuit, a plaintiff must plead three elements to establish

a First Amendment retaliation claim: (1) engagement in a constitutionally protected activity, (2) that "the defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity," and (3) that "the protected activity was a substantial or motivating factor in the defendant's conduct." *Ariz. Students' Ass'n,* 824 F.3d at 867. "[T]o prevail on such a claim, a plaintiff need only show that the defendant 'intended to interfere' with the plaintiff's First Amendment rights and that it suffered some injury as a result; the plaintiff is not required to demonstrate that its speech was actually suppressed or inhibited." *Id.* "The test is generic and objective." *O'Brien v. Welty,* 818 F.3d 920, 933 (9th Cir. 2016). *See also Brodheim v. Cry,* 584 F.3d 1262, 1271 (9th Cir. 2009) ("The district court examined several occasions on which Brodheim claims his exercise of the right to file grievances was 'chilled' . . . and concluded that Brodheim failed to produce sufficient evidence of such chilling. However, this focus on whether or not the record showed Cry was actually chilled was incorrect. . . . [A]n objective standard governs the chilling inquiry; a plaintiff does not have to show that his speech was actually inhibited or suppressed, but rather that the adverse action at issue would chill or silence a person of ordinary firmness from future First Amendment activities.") (citations and internal quotation marks omitted).

    As an initial matter, to the extent the Moving Defendants argue that Plaintiffs were still able to express their views and/or spoke to the media after learning about the challenged conduct, such assertions are not dispositive. Plaintiffs are not required to plead a total deprivation of the ability to express their views. *Mendocino Env't Ctr. v. Mendocino Cnty.,* 192 F.3d 1283, 1300 (9th Cir. 1999) ("Because it would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity, we conclude that the proper inquiry asks 'whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities.'") (citations omitted); *O'Brien,* 818 F.3d at 933 ("Whether O'Brien himself was, or would have been, chilled is not the test."); *Brodheim,* 584 F.3d at 1271 (same).

More generally, the Moving Defendants' arguments miss the forest for the trees by focusing on the specific contents of the Dossier and whether those specific documents were illegally obtained and/or private. But Plaintiffs' First Amendment retaliation claim does not turn on whether the documents in the Dossier were illegally obtained or compiled. *Ariz. Students' Ass'n*, 824 F.3d at 869 ("Otherwise lawful government action may nonetheless be unlawful if motivated by retaliation for having engaged in activity protected under the First Amendment."). The issue is whether the challenged actions would chill an ordinary person from continuing to engage in protected activity. *O'Brien*, 818 F.3d at 932-33. It is difficult to interpret the Moving Defendants' motion as challenging the objective chilling effect of the challenged conduct because none of the Moving Defendants' specific factual assertions (*i.e.*, Plaintiffs were in fact able to speak at the May 18, May 24, and August 24 board meetings, the cease-and-desist letter sent to SUSD-CAN was not a prior restraint on speech, and Plaintiffs communications with SUSD were not private) negates the objective chilling effect of the Moving Defendants' combined actions on a person of ordinary firmness.

Even ignoring these deficiencies, the Court is satisfied that the FAC pleads sufficient facts to suggest the challenged actions would chill a person of ordinary firmness. In *Arizona School Association*, defendant ABOR ("a state board whose members are appointed by the Governor and confirmed by the Arizona State Senate") directly funded the ASA, a non-profit student group, through a small per-student fee. 824 F.3d at 862-63. As part of its work, ASA advocated for a ballot initiative that would expand funding in higher education. *Id.* at 863. ABOR, which openly opposed the initiative, responded by "vot[ing] to suspend collection of the ASA fee" and "with[holding] the fee income it already had collected for the Spring 2013 semester." *Id.* The Ninth Circuit concluded that ABOR's efforts to remove ASA's funding mechanism would chill a person of ordinary firmness, both because the "acts directly undermined the ASA's ability to pursue its core purpose" and because an inherent power disparity existed between ABOR and the student

group.  *Id.* at 868-69.[3]

This is not a case where Plaintiffs merely make vague allegations of harassment.  *Compare Watison v. Carter*, 668 F.3d 1108, 1116-17 (9th Cir. 2012) ("Watison alleged no facts about Rodriguez's alleged harassing behavior, and he failed to allege that the harassment constitutes chilling conduct.").  Plaintiffs' allegations track the allegations deemed sufficient in *Arizona Students Association* in that Plaintiffs allege both a power disparity with a more powerful educational board and attempted interference with the core purpose of their Facebook group.  Accordingly, and again construing all reasonable inferences in Plaintiffs' favor (as the Court must do at the pleading stage), the Court concludes that the alleged pattern of challenged conduct would likely chill an ordinary person from continuing to speak out.

### C.   **Substantial Motivating Factor**

The briefing from the Moving Defendants on this point is difficult to decipher.  The heading describes the challenge as "fail[ure] to plead government's 'retaliatory animus' was a 'but for cause' of adverse action."  (Doc. 36 at 8.)  However, in a First Amendment retaliation case, "[a]t the pleading stage, a plaintiff adequately asserts First Amendment retaliation if the complaint alleges plausible circumstances connecting the defendant's retaliatory intent to the suppressive conduct."  *Ariz. Students' Ass'n*, 824 F.3d at 870.  Retaliatory motive can be shown by direct or circumstantial evidence, and "evidence of temporal proximity" may also be considered.  *Id.  See also Watison*, 668 F.3d at 1114 ("Because direct evidence of retaliatory intent rarely can be pleaded in a complaint, allegation of a chronology of events from which retaliation can be inferred is sufficient to survive dismissal.").  Plaintiffs simply must show "the protected activity was a substantial motivating factor in the defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech."  *Ariz. Students' Ass'n*, 824 F.3d at 867.

Here, the Moving Defendants do not offer any reasoned basis for disputing that

---

[3]   The Ninth Circuit also analyzed whether the decision to cease fee collecting was a deprivation of a valuable government benefit.  *Ariz. Students' Ass'n*, 824 F.3d at 869-70.

Mark was substantially motivated to act because of Plaintiffs' speech.   In contrast, Plaintiffs identify various allegations in the FAC that plausibly suggest a causal connection between Mark's actions and Plaintiffs' speech.  (Doc. 43 at 12-14.)  In reply, the Moving Defendants do not challenge whether Plaintiffs' protected speech was a substantial motivating factor in Mark's conduct.  (*See generally* Doc. 48 at 5-7.)

Given their underdeveloped arguments on this point, the Moving Defendants' request for dismissal on but-for causation grounds is denied.

### D.    **Standing/Individual Injury**

#### 1.    The Parties' Arguments

The Moving Defendants' final basis for challenging Count One is that "[e]ach Plaintiff fails to plead individual injury."  (Doc. 36 at 9.)  More specifically, the Moving Defendants argue that "Plaintiffs admit Ms. Stafford was not a member of the SUSD-CAN group by the time SUSD-CAN received the cease-and-desist letter on July 28, 2021, having left the group in March 2021"; that Plaintiffs "do not plead Mr. Greenburg obtained any public records regarding Plaintiff Richard [or Stafford]"; and that the interactions between Wray, Mark, Stafford, and Richard were "private."  (*Id.*)

Plaintiffs respond that "[c]ontrary to Mark's assertion otherwise, Plaintiffs did allege that Mark gathered information about Mr. Richard and shared information to the Google Drive viewers about Ms. Stafford and Mr. Richard"; that "Mark further ignores Plaintiff's allegations about how Mark, acting in concert with Jann-Michael and SUSD, made vicious attacks about Mr. Richard online"; and that Stafford's early departure from the group "is of no consequence" because "the other Defendants nonetheless engaged in other actions directed at Ms. Stafford that would chill an average person's speech" like when "Jann-Michael, using files Mark collected and stored on the Google Drive, publicly (and falsely) accused Ms. Stafford of being anti-Semitic, conspiratorial, and prejudicial." (Doc. 43 at 11-12.)

In reply, the Moving Defendants offer the same arguments regarding injury (or the lack thereof) that are summarized in Part III.B.1 above.  (Doc. 48 at 6-7.)

- 26 -

2.   <u>Analysis</u>

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "[T]he irreducible constitutional minimum of standing contains three elements": (1) a concrete and particularized injury in fact; (2) a causal connection between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision.  *Id.* at 560-61.  "A chilling of First Amendment rights can constitute a cognizable injury, so long as the chilling effect is not 'based on a fear of future injury that itself [is] too speculative to confer standing.'" *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020) (citation omitted).  "First Amendment challenges . . . present unique standing considerations such that the inquiry tilts dramatically toward a finding of standing . . . because, as the Supreme Court has recognized, a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury." *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) (citations omitted).

As stated in Part III.C above, Plaintiffs have plausibly alleged that Defendants acted in a way that would chill a person of ordinary firmness.  It follows that each Plaintiff has "show[n] he personally has suffered some actual or threatened injury." *Valley Forge Christian Colls. v. Ams. United for Separation of Church and State*, 454 U.S. 464, 472 (1982).   The Moving Defendants' arguments to the contrary are based on a misapprehension of what qualifies as an injury in this context—as noted, a chilling effect (which is measured objectively) may itself suffice, even if each Plaintiff was not in fact deterred from engaging in further protected activity.  At any rate, the FAC also contains specific allegations regarding each individual Plaintiff.  As for Richard, there is an inference that he posted something opposing the District on September 12, 2020 (in the Facebook Group) by virtue of Mark's response through the pseudonym of Guy Phillips. (Doc. 34 ¶ 29 ["Hi Edmond.  I agree with you completely . . . .].)  The FAC also specifically alleges that Mark publicly insulted Richard at another time.  (*Id.* ¶ 51.)  As for Stafford,

after she "publicly supported in-person schooling," Mark "made veiled threats against her employment" both publicly and via direct message.  (*Id.* ¶ 48.)  As for Wray, the FAC generally alleges that she was critical of the District (which neither side disputes) and that, in response, Mark physically intimidated her at a board meeting (*id.* ¶ 53), insulted her via direct Facebook message (*id.* ¶ 55), and later that year, disparaged her to another parent association (*id.* ¶ 49)—all to prevent her continued criticisms.  (*See also* Doc. 43 at 11-12 [Plaintiffs' summary of conduct and harm].)  Finally, Plaintiffs allege their speech was in fact censored when they were prevented from expressing their views at the August 24 board meeting.  (*Id.* ¶ 39.)

## IV. Count Three: Intentional Infliction Of Emotional Distress

In Count Three, Plaintiffs allege that Mark "engaged in 'extreme' and 'outrageous' conduct by amassing voluminous records about Plaintiffs on the Google Drive, including, without limitation, photographs of Amanda Wray and Kim Stafford's respective children, financial documents, background checks, employment information, mortgage information, and more, and sharing that information with SUSD officials and others."  (Doc. 34 ¶ 124.) Plaintiffs further allege that they "each suffered emotional distress sufficiently severe so as to manifest physical symptoms as a result of [Mark's] actions."  (*Id.* ¶ 127)

### A. **The Parties' Arguments**

The Moving Defendants outline the elements of an intentional infliction of emotional distress ("IIED") claim as follows: "Plaintiffs bear the burden of proving: (1) [Mark] engaged in 'extreme' and 'outrageous' conduct; (2) [Mark] must have intended to cause emotional distress to the Plaintiffs or recklessly disregard the near certainty that the Plaintiffs will suffer emotional distress as a result of their conduct; and, (3) the Plaintiffs did, in fact, suffer severe emotional distress as a result of Defendants' conduct." (Doc. 36 at 12.)  They argue the FAC is deficient because it does not allege (1) the requisite extreme or outrageous conduct; or (2) severe emotional distress.  (*Id.* at 13-14.)  As for the former, the Moving Defendants argue that "Plaintiffs are seeking to make unlawful the extremely common practice of documenting and storing publicly available information about

individuals." (*Id.* at 14.)  As for the latter, the Moving Defendants argue that Wray's vomiting is not severe emotional distress under Arizona law and that "Daniel Wray, Richard, and Stafford plead *no* physical manifestation or any severe emotional distress whatsoever, solely alleging that 'Plaintiffs each suffered emotional distress sufficiently severe so as to manifest physical symptoms,' but do not identify any symptoms."[4] (*Id.*)

Plaintiffs respond that "Mark's conduct went far beyond 'documenting and storing publicly available information about people,' both in terms of what Mark collected, and what he did with it.  Mark collected photographs of Mses. Wray and Stafford's minor children; amassed voluminous amounts of records about Plaintiffs that he shared with their children's school district; and released personal information about Plaintiffs in an attempt to retaliate against them for their speech.  Mark glosses over the reality of his behavior, which meets the definition of 'extreme and outrageous.'" (Doc. 43 at 17.)  Plaintiffs also argue that "pleading that each [Plaintiff] sustained severe emotional distress, including that the distress caused Ms. Wray to vomit when she discovered what Mark had stored on the Google Drive," was sufficient.  (*Id.*)

In reply, the Moving Defendants contend that "Plaintiffs seem to give up on the emotional distress claims." (Doc. 48 at 10.)  The Moving Defendants contend that "[n]o interpretation of the facts alleged by Plaintiff could lead a reasonable person to conclude that [Mark's] conduct was 'atrocious' or 'beyond all possible bounds of decency.'"[5] (*Id.* at 11.)  The Moving Defendants also "maintain that Plaintiffs Richard and Stafford plead no physical manifestation or any severe emotional distress whatsoever anywhere in the complaint" and therefore "this cause of action should be dismissed in its entirety." (*Id.*)

B.   **Analysis**

Under Arizona law, "[t]he three required elements [of an IIED claim] are: *first*, the conduct of the defendant must be 'extreme' or 'outrageous'; *second*, the defendant must

---

[4]     To avoid confusion, the Court notes that Daniel Wray is not a party to this lawsuit.

[5]     The Moving Defendants also attempt to dispute some of the factual assertions in the FAC, such as disputing whether Wray's vomiting reaction was an "exaggeration" or whether she was "sick to her stomach when she appeared on Fox News." (Doc. 48 at 10-11.)  These arguments are misplaced at the motion-to-dismiss stage.

either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and *third*, severe emotional distress must indeed occur as a result of defendant's conduct." *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987). Outrageous or extreme conduct goes "beyond all possible bounds of decency" and is "regarded as atrocious and utterly intolerable in a civilized community in which an average member of the community would exclaim, 'Outrageous!'" *Id.* (quoting Restatement (Second) of Torts § 46(1) cmt. b) (cleaned up). *See also Christakis v. Deitsch*, 478 P.3d 241, 245 (Ariz. Ct. App. 2020)  ("Such conduct must completely violate human dignity and strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.") (citation and internal quotation marks omitted).  As for the final requirement that the emotional distress be "severe," "[e]xamples of emotional distress considered severe by the courts [include] . . . heart attack and nervous exhaustion," "premature birth of dead baby," "severe nervousness and headaches resulting in such a breakdown of [the plaintiff's] physical and emotional well being that she was unable thereafter to perform her job," "severe headaches and stress and [the plaintiff's] state of anxiety ultimately required hospitalization," and "stress and a relapse resulting in a permanent impairment of [the plaintiff's multiple sclerosis] condition." *Midas Muffler Shop v. Ellison*, 650 P.2d 496, 501 (Ariz. Ct. App. 1982) (citations omitted).

Here, the most glaring defect in the FAC regarding Count Three is the absence of factual allegations describing Plaintiffs' emotional distress.  The only specific allegation of emotional distress is that "[w]hen Amanda Wray discovered the staggering amount of information Mark Greenburg had compiled about her or purportedly about her, Ms. Wray became physically ill and vomited."  (Doc. 34 ¶ 63.)  Although the FAC also includes the conclusory assertion that "Plaintiffs each suffered emotional distress sufficiently severe so as to manifest physical symptoms as a result of [Mark's] actions" (*id.* ¶ 127), no corresponding details are alleged in the 156-paragraph complaint apart from the one allegation regarding Wray's vomiting episode.  This, alone, requires the dismissal of Stafford's and Richard's IIED claims.  *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice.").

As for Wray, the single instance of vomiting does not rise to the level of "severe" emotional distress as required under Arizona law. In *Midas Muffler Shop*, the Arizona Court of Appeals not only described the sorts of emotional distress that *could* qualify as "severe" for purposes of an IIED claim—including heart attacks, nervous episodes requiring hospitalization, and the premature birth of a dead baby—but held that the plaintiff's IIED claim failed as a matter of law where she merely testified that the challenged conduct "upset her and made her cry, and that she had difficulty sleeping on several occasions after" the conduct. 650 P.2d at 501. The court emphasized that "[i]t is only where [emotional distress] is extreme that the liability arises. Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people." *Id.* at 501 (quoting Restatement (Second) of Torts § 46 cmt. j). Wray's single instance of vomiting is insufficient to show severe emotional distress and instead evidences a "transient" emotional response.[6]

V.   Count Four: Negligent Infliction Of Emotional Distress

In Count Four, Plaintiffs assert a claim for negligent infliction of emotional distress ("NIED"). As with Count Three, Plaintiffs allege that they "experienced emotional distress when they discovered the existence and contents of the Google Drive" that "was sufficiently severe so as to manifest physical symptoms as a result of [Mark's] actions. For example, Amanda Wray vomited when she discovered the information about her stored on the Google Drive." (Doc. 34 ¶¶ 132-33.) Plaintiffs further allege that Mark "knew or should have known [that] amassing vast amounts of Plaintiffs' and community members' personal records, as well as records that would portray Plaintiffs and community members

---

[6]   The Court is also skeptical that the challenged conduct would qualify as extreme or outrageous. *See generally Christakis*, 478 P.3d at 245 (noting extreme or outrageous conduct "does not include 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities'") (citation omitted). However, it is unnecessary to reach that issue in light of the deficiency of Plaintiffs' allegations regarding severe emotional distress.

in a false light, involved an unreasonable risk of causing distress" and that "the emotional distress that would likely result from Plaintiffs' discovery of the Google Drive might result in illness or bodily harm." (*Id.* ¶¶ 134-35.)

## A.   **The Parties' Arguments**

The Moving Defendants argue that Plaintiffs failed to plead a prima facie case of NIED "either as a witness or direct participant." (Doc. 36 at 15.) They argue that to plead "a claim for NIED as a witness, Plaintiffs must plead facts sufficient to prove: (1) the Plaintiffs witnessed an injury to a closely related person; (2) the Plaintiffs suffered mental anguish that manifested itself as a physical injury; and, (3) the Plaintiffs were within the 'zone of danger' such that [Mark] subjected the Plaintiffs to an unreasonable risk of bodily harm." (*Id.*, citations omitted.) The Moving Defendants argue that "[n]o interpretation of the facts pled by the Plaintiffs demonstrates (1) the witnessing of any injury to a closely related person; (2) any physical injury to any person, that there is any 'zone of danger,' or that the alleged emotional distress manifested itself as a physical injury." (*Id.*) Next, as for a direct NIED claim, the Moving Defendants argue that "Plaintiffs must plead facts sufficient to prove: (1) the defendant was negligent; (2) defendant's negligence created an unreasonable risk of bodily harm to plaintiff; (3) and defendant suffered physical injury or illness due to the emotional distress." (*Id.*) The Moving Defendants contend that "Plaintiffs do not plead any facts showing that [Mark] created an unreasonable risk of bodily harm to plaintiffs, that plaintiffs were in a 'zone of danger' of sustaining bodily harm, or that plaintiffs suffered any physical injury or illness as a result," in part because Wray's vomiting is not an injury and because no facts support Stafford's or Richard's claims. (*Id.* at 16.)

Plaintiffs respond that an NIED claim only requires two elements: "(a) [the tortfeasor] should have realized that his conduct involved an unreasonable risk of causing the distress . . . and (b) from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm." (Doc. 43 at 18.) Plaintiffs contend that the FAC is sufficient to state a claim under this standard because "[i]t was entirely

foreseeable, and Mark should have known, that when he stored a massive trove of sensitive information about Plaintiffs on an unsecured Google Drive, and shared that drive with three other people, the Google Drive might become public, and that Plaintiffs would suffer emotional distress as a result." (*Id.*)

In reply, the Moving Defendants argue that "Plaintiffs appear to concede this claim." (Doc. 48 at 11.)  They reiterate that "Plaintiffs do not plead any facts to demonstrate (1) the witnessing of any injury to a closely related person; (2) any physical injury to any person, that there is any 'zone of danger,' or that the alleged emotional distress manifested itself as a physical injury." (*Id.*)

B.    **Analysis**

Under Arizona law, "[d]amages for emotional disturbance alone are too speculative" to support "recovery for the tort of negligent infliction of emotional distress. *Keck v. Jackson*, 593 P.2d 668, 669-70 (Ariz. 1979).  Instead, "the Arizona cases and Restatement § 436A make clear that a physical injury, as well as a long-term physical illness or mental disturbance, constitute[] sufficient bodily harm to support a claim of negligent infliction of emotional distress." *Monaco v. HealthPartners of S. Ariz.*, 995 P.2d 735, 739 (Ariz. Ct. App. 1999). "'Transitory physical phenomena' such as weeping and insomnia 'are not the type of bodily harm which would sustain a cause of action for emotional distress.'" *Gau v. Smitty's Super Valu, Inc.*, 901 P.2d 455, 457 (Ariz. Ct. App. 1995) *Id.* (citations omitted).  *See generally Dehart v. Johnson & Johnson*, 562 F. Supp. 3d 189, 196-97 (D. Ariz. 2022) ("[T]he rule in Arizona is that when an NIED plaintiff seeks recovery for an emotional injury unaccompanied by a physical injury, the plaintiff must show that the emotional injury eventually resulted in some form of bodily harm, such as a physical injury or a long-term physical illness or mental disturbance.") (cleaned up).

As with the IIED claim, Plaintiffs Stafford and Richard have not pleaded any facts suggesting they suffered a physical injury or bodily harm (or, indeed, any specific injury, emotional or otherwise, at all).  Therefore, their NIED claims fail.

As for Wray, although the FAC pleads that she became physically ill and vomited,

a single instance of vomiting is a transitory phenomenon that is insufficient to support an NIED claim.  *Cf. Gau*, 901 P.2d at 455, 457 (rejecting NIED claim, where a four-year-old child suffered "transitory nightmares and sleep disturbance" after his mother was falsely accused of shoplifting and the mother and child were detained and separated, because the child "suffered no physical injury" and the emotional injuries "subsided without medical treatment").

## VI.  Count Five: Defamation

In Count Five, Wray alleges that Mark defamed her by "plac[ing] a bankruptcy filing belonging to one Amanda J. Ross in the Google Drive" which implied "that Amanda Wray, a professional financial advisor, had filed for bankruptcy under her maiden name of 'Amanda Ross.'"  (Doc. 34 ¶¶ 140, 143.)  Wray continues: "The false notion that Amanda Wray filed for bankruptcy would bring her into disrepute, contempt, or ridicule, as she is a financial advisor, and would also tend to harm her professional reputation."  (*Id.* ¶ 144.)  Wray further alleges that, at a minimum, Mark published the document to "[Jann-Michael], Zach Lindsay, and Jennifer McDowell" and that Mark "knew" or "acted in reckless disregard" of the fact that she had not filed for bankruptcy, by virtue of the background check on her that Mark obtained in January 2021.  (*Id.* ¶¶ 142, 145.)

### A.  **The Parties' Arguments**

The Moving Defendants argue that "Wray is, at a minimum, a limited purpose public figure if not a general public figure and must additionally plead [Mark] acted with actual malice" and that the FAC fails on this score because it only alleges that Mark "knew or should have known" about the middle initial because of the background check, which does not rise to the level of malice.  (Doc. 36 at 10-11.)  Alternatively, the Moving Defendants argue that the act of uploading the document is not a "statement" under Arizona law, so it cannot give rise to a defamation claim.  (*Id.* at 10-11.)  As for the publication element, the Moving Defendants argue that "Wray provides no factual support" that any defamatory material was published to anyone because she "does not even plead that anyone other than [Mark] accessed or saw the bankruptcy pleading" and any other allegations are

"speculative." (*Id.*)   Finally, the Moving Defendants argue that imputing liability to "widespread background research" that might be "inaccurate" after the fact would "undoubtedly chill First Amendment rights." (*Id.* at 11.)

Plaintiffs respond that "Mark's argument that his placement of the bankruptcy record on [the] Google Drive was not a 'statement' is inconsistent with Arizona law." (Doc. 43 at 14.)   According to Plaintiffs, the proper inquiry is "whether Mark used the bankruptcy filing to imply an idea about Ms. Wray (i.e., that she declared bankruptcy)" and, under that test, "Mark's inclusion of the bankruptcy filing on the Google Drive falsely conveyed to the other Google Drive viewers that Ms. Wray had filed bankruptcy.   Mark therefore made a defamatory communication." (*Id.* at 14-15.)   As for the publication element, Plaintiffs argue it only requires "communication to a third party" and by placing the bankruptcy filing into the Google Drive, Mark shared it with "Jann-Michael, Mr. Lindsay, and Jennifer McDowell." (*Id.*)   Plaintiffs argue it is far from speculative to infer that those individuals saw the filing, given that the Restatement only requires "an unreasonable risk that the defamatory matter will be communicated to a third person." (*Id.*)   Plaintiffs also contend that "Mark's intent is made ever more evident by the fact that he also included on the Google Drive a meme in which he disparaged Ms. Wray's 'dubious financial planning services' and stated that Ms. Wray did not have 'her own financial house in order' because of the mortgages on her primary home and vacation home.'" (*Id.*)   Finally, regarding malice, Plaintiffs argue "[t]here are no facts in the FAC that support the conclusion that Ms. Wray was a public figure—she was a mother who spoke out about school board policy." (*Id.* at 16.)   In the alternative, Plaintiffs contend they adequately pleaded malice because Mark's possession of the background check "shows that Mark either knew the bankruptcy petition was not Ms. Wray's or acted in reckless disregard for the truth." (*Id.*)   Plaintiffs also note that defamation is not protected by the First Amendment and any factual arguments about "background research" are inappropriate on a motion to dismiss. (*Id.*)

In reply, the Moving Defendants argue that "[t]he most favorable reading of

1  Plaintiff's allegations is that they are speculative in nature and utterly conclusory." (Doc.

2  48 at 8.)  They contend that uploading the bankruptcy filing cannot be considered a

3  "statement," especially given that "[i]f someone did view the filing and paid close attention

4  to detail, they would notice that the filing contained the name of an individual with a similar

5  maiden name as [Ms.] Wray with a different middle initial." (*Id.* at 9.)  The Moving

6  Defendants also argue that any implication that Wray filed for bankruptcy would be "based

7  on sheer speculation" and note the absence of any allegation that there was any "impact on

8  Ms. Wray's business" or that "her clients ever saw the filing." (*Id.*)  Finally, the Moving

9  Defendants argue that Wray's "appearances on politically charged media outlets" confer,

10  at a minimum, limited purpose public figure status.  (*Id.* at 8-9.)

11      B.    **Analysis**

12      Arizona "follows the Restatement (Second) of Torts (1977) . . . on claims relating

13  to defamation of a private person." *Desert Palm Surgical Grp., P.L.C. v. Petta*, 343 P.3d

14  438, 449 (Ariz. Ct. App. 2015).  Under the Restatement, "[t]o create liability for defamation

15  there must be: (a) a false and defamatory statement concerning another; (b) an unprivileged

16  publication to a third party; (c) fault amounting at least to negligence on the part of the

17  publisher; and (d) either actionability of the statement irrespective of special harm or the

18  existence of special harm caused by the publication." Restatement (Second) of Torts § 558.

19  "In an ordinary defamation action between private individuals, a speaker may be liable for

20  damages if a falsehood is published that injures the plaintiff's reputation.  'Unless this is

21  free from reasonable doubt, it is for the jury to determine the meaning and construction of

22  the alleged defamatory language.'" *Rogers v. Mroz*, 502 P.3d 986, 990 (Ariz. 2022)

23  (internal citations omitted).  Further, a defamatory statement "need not identify the

24  defamed person by name." *Id.*  Rather, "'it is enough that there is such a description of or

25  reference to him that those who hear or read reasonably understand the plaintiff to be the

26  person intended,' which may be supported by extrinsic facts." *Id.* (quoting Restatement

27  (Second) of Torts § 563 cmt. e).  Defamation by implication, which is recognized in

28  Arizona, acknowledges that a statement may be actionable if it "implies a clearly

defamatory meaning." *Id.*

The analysis differs when the plaintiff asserting a defamation claim is not a private person but a public official or public figure. In *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), the Supreme Court held that "a public official" may not recover damages for a defamatory falsehood "relating to his official conduct unless he proves that statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279-83. "Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974). "In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions." *Id.* at 351.

Construing the FAC in the light most favorable to Plaintiffs, the allegations do not support that Wray sought the "public's attention" such that she should be held to the highted requirements of a limited purpose public figure. The Moving Defendants fail to identify any factual allegations in the FAC that suggest Wray was a public figure. Instead, the Moving Defendants use their reply brief to inject the new factual allegation that Wray made "appearances on politically charged media outlets" and then attempt to rely on that purported fact to argue that "she is certainly a limited purpose public figure, at a minimum." (Doc. 48 at 9.) But there are no factual allegations in the FAC regarding Wray's appearances on media outlets (politically charged or otherwise). The Moving Defendants cannot secure dismissal under Rule 12(b)(6) by asserting new facts, which don't appear in the complaint, for the first time in their reply brief. *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989) ("Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.").

1    Therefore, at least for motion-to-dismiss purposes, Wray was not required to plead actual

2    malice.

3         The Moving Defendants' other arguments fare no better.   As noted, Wray was

4    required to plead sufficient facts to establish the following four elements: (1) a false and

5    defamatory statement, (2) publication, (3) fault—at least negligence, and (4) harm.

6    Restatement (Second) of Torts § 558.  The Moving Defendants do not challenge element

7    four in their motion[7] and only challenge the third element as it relates to malice, as

8    discussed above.

9         As for the first element, Wray has adequately pleaded there was a "statement" within

10   the meaning of Arizona law.  The Restatement explains that "[t]he word 'communication'

11   is used to denote the fact that one person has brought an idea to the perception of another."

12   Restatement (Second) of Torts § 559 cmt. a.  It is reasonable to infer that, by uploading the

13   bankruptcy filing, Mark intended to convey to the perception of another (*i.e.*, those with

14   access to the drive) the idea that Wray had filed for bankruptcy.[8]

15        As for the second element, the FAC adequately alleges that Mark published the

16   statement.  The FAC alleges that Mark uploaded the bankruptcy filing to the "public"

17   Google drive, to which at least three people had access.  (Doc. 34 ¶¶ 25, 62.)  The FAC

18
─────────────
19   [7]      In their reply, the Moving Defendants assert that "[t]here is no allegation that the
20   filing of someone else's bankruptcy history had any impact on Ms. Wray's business" and
     that "there is no allegation that any of her clients even saw the filing."  (Doc. 48 at 9.)  To
20   the extent these arguments are intended to challenge the sufficiency of the FAC's
     allegations concerning the harm/damage element of Wray's defamation claim, they come
21   too late—the Moving Defendants did not raise a challenge to that aspect of Count Five in
     their motion.  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court
22   need not consider arguments raised for the first time in a reply brief.").

23   [8]      The Court further notes that such a communication could injure Wray's reputation
     as a financial advisor if a person believed she had previously filed for bankruptcy.  *Rogers*,
24   502 P.3d at 990 (permitting defamation by implication when the statement "implies a
     clearly defamatory meaning").   The name on the filing closely matches Wray's maiden
25   name.  (Doc. 34 ¶ 25.)  It also matches her home state.  (*Id.*)  Given those details, and
     because Wray was one of the main subjects of the materials compiled within the Dossier,
26   it is reasonable that Jann-Michael, Jennifer, and Zach, all of whom had access to the drive,
     would believe the filing concerned Wray.  *Rogers*, 502 P.3d at 990 (permitting extrinsic
27   facts to support defamatory meaning).   The meme about Wray's "dubious financial
     planning services" (Doc. 34 ¶ 65), which was also included in the Dossier, further supports
28   the inference that the bankruptcy filing was intended to convey a negative perception
     regarding Wray's financial wherewithal.

also alleges that "Jann-Michael and the District were curating and collecting Plaintiffs' and other parents' personal information and communications and supplying it to be stored in the Google Drive" and that "Defendants had a pattern and practice of using SUSD funds, access, and resources to contribute Plaintiffs' private information to the Google Drive's cache of data." (*Id.* ¶ 30.) Thus, when Mark uploaded the bankruptcy filing, it would have been published—at a minimum—to Jann-Michael, a third party.

## VII.   Count Six: False Light Invasion Of Privacy

In Count Six, Wray alleges that Mark "gave publicity to information about Amanda J. Ross's bankruptcy petition in such a way as to convey to the viewer that Amanda Wray filed a petition for bankruptcy, which she did not." (Doc. 34 ¶ 152.) Wray alleges that it would be "highly offensive to a reasonable person in [her] position (i.e., a professional financial advisor) to be placed in the false light of having filed for bankruptcy." (*Id.* ¶ 153.)

### A.   The Parties' Arguments

The Moving Defendants argue that Wray cannot meet the first prong of a false light claim, namely that Mark gave publicity to the bankruptcy filing. (Doc. 36 at 11-12.) According to the Moving Defendants, "Ms. Wray solely pleads that [Mark] 'placed a bankruptcy filing' into a computer server to which three others had access," which is insufficient to show that the matter was "made public," *i.e.*, the information was "communicat[ed] to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." (*Id.* at 12, citations omitted.)

In response, Plaintiffs argue that publication to a small group of people is sufficient to satisfy the publicity element. (Doc. 43 at 16-17.) Plaintiffs further note that because "Mark configured the Google Drive so that it was viewable by anyone with a link, not just the three primary viewers . . . Mark's actions (including the Google Drive) became public." (*Id.*)

In reply, the Moving Defendants argue that "Plaintiff Wray all but concedes the false light claim is unsubstantiated" because she "fails to demonstrate [Mark] 'gave

publicity' to the bankruptcy filing." (Doc. 48 at 10.) They further argue that if anyone gave publicity to the filing, it was Wray, who "went on major media news outlets to discuss the contents of the Google drive and her extreme dislike of [Mark]" and "has used this case to launch herself into the public political arena," especially given that "after filing the initial lawsuit in this case, Ms. Wray held a press conference with her lawyers." (*Id.*) Based on these actions, the Moving Defendants contend that "[h]er actions are inconsistent with someone who has been 'highly offended' by the alleged bankruptcy filing." (*Id.*) Finally, the Moving Defendants argue that the Google drive was "private" and "not intended to be accessed by the public," so it is unlike the examples set out in the Restatement that indicate publication is satisfied if "a creditor post[s] a notice in the window of a debtor's shop for all shop patrons to see." (*Id.*)

B.    **Analysis**

The Arizona Supreme Court has adopted the tort of false light invasion of privacy from the Restatement (Second) of Torts § 652E. *Godbehere v. Phx. Newspapers, Inc.*, 783 P.2d 781, 787-88 (Ariz. 1989). "[T]he tort is established if the defendant knowingly or recklessly published false information or innuendo about the plaintiff that a reasonable person would find highly offensive." *Hart v. Seven Resorts Inc.*, 947 P.2d 846, 854 (Ariz. Ct. App. 1997). In *Hart*, the court provided the following explanation of the difference between "publication" for defamation purposes and "publicity" for false light purposes:

> "Publicity" as it is used in this Section, differs from "publication" [for defamation purposes] . . . which includes any communication by the defendant to a third person. "Publicity" on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded substantially certain to become one of public knowledge. The difference is not one of the means of communication which may be oral, written, or by any other means. It is one of a communication that reaches, or is sure to reach, the public. [I]t is not an invasion of the right of privacy . . . to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons. On the other hand, any publication in a newspaper or magazine, even of small circulation, . . . or statement made in an address to a large audience, is sufficient.

*Hart*, 947 P.2d at 854 (quoting Restatement (Second) of Torts § 652D).

Wray relies on paragraphs 62 and 66 of the FAC to support her assertion that Mark

publicized the bankruptcy filing to a large group of people.  (Doc. 43 at 17.)  Paragraph 62 recounts that when Wray was provided with the hyperlink that Mark "had broadcast," the Drive was "openly accessible by anyone with the link."  (Doc. 34 ¶ 62.)  The files were shared with "Jann-Michael," "Zach Lindsay," and "Jennifer McDowell."  (*Id.*)  Paragraph 66 alleges that "[w]hen Defendants' conspiracy became public, the District hired Hennes Communications, a crisis management and communications firm, which it paid at least $16,963.00 for consulting and 'Social Media Monitoring.'"  (*Id.* ¶ 66.)

Even reading these allegations in the light most favorable to Wray, it is not reasonable to construe paragraphs 62 and 66 as alleging widespread dissemination of the Dossier, much less the bankruptcy filing.  Looking back to paragraph 61, the hyperlink was disclosed in what appears to be a private email exchange between Jann-Michael and Stafford.  (*Id.* ¶ 61.)  Even assuming the link was public and thus theoretically accessible to anyone, there are no facts that suggest the link was *in fact* widely disseminated or placed in a location where anyone could access it.  In *Hart*, the court stated that something other than an overt act is required to communicate the false impression, citing a Kentucky case in which the court held that firing an employee alone was not enough to prove publicity.  947 P.2d at 854-55 (citing *Stewart v. Pantry, Inc.*, 715 F. Supp. 1361, 1369-70 (W.D. Ky. 1988)).  Instead, the employer needed to have "communicated the reasons for plaintiffs' termination to members of the public."  *Id.* at 854.  Here, there are no facts suggesting that Mark "publicized" the bankruptcy filing in a manner sufficient to trigger false-light liability.  Emailing a public link to a shared drive to a single person is unlike publicizing information in a regional magazine or newspaper.  The FAC accuses three people of having access to and viewing the Google drive, but publication to a small number of people is insufficient to satisfy the publicity element in a false light action.  The mere possibility that others could have accessed the Google drive does not satisfy the requirement that "the matter . . . be regarded substantially certain to become one of public knowledge." Restatement (Second) of Torts § 652D cmt. a.

…

VIII.   <u>Punitive Damages</u>

Plaintiffs seek punitive damages pursuant to each of their claims against the Moving Defendants.  (Doc. 34 ¶¶ 108, 130, 138, 148, 156.)

A.   **The Parties' Arguments**

The Moving Defendants argue that no punitive damages can be assessed because, under Arizona law, a public employee who acts within the course and scope of his employment cannot be held liable for punitive damages.  (Doc. 36 at 16.)  The Moving Defendants argue that, because Plaintiffs have alleged that Mark acted under color of law, it follows that punitive damages are unavailable.  (*Id.*)

Plaintiffs respond that (1) Mark is not a public employee; and (2) even if he were, he could still be liable for punitive damages pursuant to the § 1983 claim.  (Doc. 43 at 18.)

In reply, the Moving Defendants pivot and argue for the first time that "Plaintiffs cannot demonstrate any reckless or callous indifference to the rights of others" and that "Mark did not engage in any conduct amounting to evil motive."  (Doc. 48 at 12.)

B.   **Analysis**

As explained in Part II.A above, the FAC does not support the conclusion that Mark is a "public employee" under Arizona law.   Therefore, punitive damages remain recoverable based on Plaintiffs' state-law claims, notwithstanding A.R.S. § 12-820.04 ("Neither a public entity nor a public employee acting within the scope of his employment is liable for punitive or exemplary damages.").  As for the Moving Defendants' broader challenge to the sufficiency of the factual allegations underlying all of Plaintiffs' punitive damage claims, the challenge is forfeited because it was raised for the first time in a reply brief. *Zamani,* 491 F.3d at 997.

IX.   <u>Leave to Amend</u>

In their response to the motion to dismiss, "Plaintiffs request leave to file a Second Amended Complaint to plead additional factual material sufficient to cure any legal defect."  (Doc. 43 at 18.)  In reply, the Moving Defendants contend that "[b]ased on their response to the motion to dismiss, Plaintiffs seem to come to grips with the fact that they

1    failed to state claims for defamation, false light, and the emotional distress causes of

2    action" and request the FAC "be dismissed in its entirety, with prejudice." (Doc. 48 at 12.)

3        Rule 15(a) of the Federal Rules of Civil Procedure "advises the court that 'leave [to

4    amend] shall be freely given when justice so requires.'" *Eminence Cap., LLC v. Aspeon,*

5    *Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citation omitted). "This policy is 'to be applied

6    with extreme liberality.'" *Id.* (citation omitted). Thus, leave to amend should be granted

7    unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith;

8    (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v.*

9    *Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

10       It appears the Moving Defendants rely on futility as their basis for opposing

11   Plaintiffs' request for leave to amend. (Doc. 48 at 12.) Although it is true that "the test for

12   futility is whether the amendment can survive a motion to dismiss under Rule 12(b)(6),"

13   *Fulton v. Advantage Sales & Mktg., LLC*, 2012 WL 5182805, *3 (D. Or. 2012),

14   "[o]rdinarily, courts will defer consideration of challenges to the merits of a proposed

15   amended pleading until after leave to amend is granted and the amended pleading is filed."

16   *Fair Hous. Council of Cent. Calif., Inc. v. Nunez*, 2012 WL 217479, *4 (E.D. Cal. 2012);

17   *see also Green Valley Corp. v. Caldo Oil Co.*, 2011 WL 1465883, *6 (N.D. Cal. 2011)

18   (noting "the general preference against denying a motion for leave to amend based on

19   futility"). Therefore, without prejudging the merit of any futility argument, the Court will

20   grant Plaintiffs' request for leave to file a Second Amended Complaint to the extent they

21   wish to attempt to address the deficiencies that led to the dismissal of the IIED, NIED, and

22   false light claims.

23       …

24       …

25       …

26       …

27       …

28       …

Accordingly,

**IT IS ORDERED** that the Moving Defendants' motion to dismiss (Doc. 36) is **granted in part and denied in part**.  Counts Three, Four, and Six are dismissed.

**IT IS FURTHER ORDERED** that Plaintiffs may file a Second Amended Complaint within 21 days of the issuance of this order.  Any changes shall be limited to attempting to cure the deficiencies raised in this order and Plaintiffs shall, consistent with LRCiv 15.1(a), attach a redlined version of the pleading as an exhibit.

Dated this 16th day of December, 2022.

Dominic W. Lanza
United States District Judge